UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 12-80597-CIV-MARRA/MATTHEWMAN

FEDERAL TRADE COMMISSION,

    Plaintiff,

    v.

STERLING PRECIOUS METALS, LLC, *et al*.,

    Defendants.
_____/

## ORDER ON PLAINTIFF'S AMENDED MOTION TO COMPEL PRODUCTION OF DOCUMENTS

THIS CAUSE is before the Court upon Plaintiff Federal Trade Commission (the "FTC")'s Amended Motion to Compel Production of Documents from Defendant Sterling Precious Metals, LLC [DE 61]. Defendant Sterling Precious Metals, LLC ("Sterling") has filed a response [DE 67], to which Plaintiff has replied [DE 74].[1] Sterling separately filed two declarations in support of its opposition to the motion. *See* DE 75. A hearing was held on March 22, 2013. In response to orders of the Court, the parties filed supplemental papers, s*ee* DEs 78–79, and the matter is now ripe for disposition. For the following reasons, Plaintiff's motion is **GRANTED in part and DENIED in part.**

---

[1] Plaintiff initially filed a reply brief at Docket Entry 68, but with leave of court, *see* DEs 72–73, later filed an amended reply brief at Docket Entry 74. The Court has only considered the amended version in its determination of this matter.

1

### I.      Background

On June 4, 2012, the FTC filed a complaint against Sterling and three of its members. The Complaint accuses the defendants of various violations of the FTC Act, 15 U.S.C. §45(a), and the Telemarketing Sales Rule, 16 C.F.R. pt. 310, in connection with certain precious metals investments that the defendants offered to the general public.  The FTC also simultaneously moved for the entry of a temporary restraining order and a preliminary injunction.  DE 3.  After a hearing, the request for preliminary relief was denied.  *See* DE 45.   On February 21, 2013, the FTC filed the instant Amended Motion to Compel Production of Documents [DE 61].  The FTC seeks to compel responses to its requests for production numbers 1 through 23.

### II.     Legal Standard

In the federal courts, civil litigants

> may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense—including the existence, description, nature, custody, condition, and location of any documents or other tangible things and the identity and location of persons who know of any discoverable matter.

Fed. R. Civ. P. 26(b)(1).  Where, as here, the substantive cause of action is federal, the nature and scope of any applicable privileges is determined by federal common law.  *See* Fed. R. Evid. 501.

### III.    Discussion

**A. The Right to Financial Privacy Act**

Sterling objects to a number of the FTC's requests, primarily those dealing with customer records, on the basis of the Financial Institutions Regulatory Act of 1978, otherwise known as the Right to Financial Privacy Act, 12 U.S.C. §§ 3401–3422 ("RFPA").  The RFPA was enacted

2

in response to the Supreme Court's decision in *United States v. Miller*, 425 U.S. 435 (1976), which held that bank depositors have no reasonable expectation of privacy with respect to their bank records, and therefore no constitutional standing to challenge the Government's access to those records. H.R. REP. NO. 95-1383, at 34 (1978). The RFPA "accords customers of banks and similar financial institutions certain rights to be notified of and to challenge in court administrative subpoenas of financial records in the possession of the banks." *SEC v. Jerry T. O'Brien, Inc.*, 467 U.S. 735, 745 (1984). The RFPA applies only to "financial institutions." *See, e.g.,* 12 U.S.C. § 3402. Sterling contends that it is a financial institution as defined by the RFPA, and resists discovery of its customer records because the FTC has not obtained permission from its customers pursuant to the RFPA.

### 1. It is Unclear Whether the RFPA is a Proper Objection to Discovery Requests in Civil Actions

The parties here assume that the RFPA, standing alone, is a proper objection to a discovery request within the context of a civil suit. The discovery rules allow a party to withhold *privileged* matter. Although the RFPA does bind the Government in its pre-suit investigatory posture (*e.g.* in the issuance of administrative subpoenas), at least one court has held that it does not apply in the context of civil actions. *See Clayton Brokerage Co., Inc. of St. Louis v. Clement*, 87 F.R.D. 569, 570 (D. Md. 1980). ("The Financial Privacy Act is an express limitation on the authority of government agencies to acquire records of an individual's financial transactions. The Act, however, provides no justification for a bank's noncompliance with a subpoena issued in a civil action."). Nonetheless, because no party here has challenged the propriety of the RFPA as a discovery objection, the Court proceeds to reach the merits of the dispute.

3

### 2. The RFPA Does Not Apply to Sterling Because Sterling is Not a Consumer Finance Institution

By its terms, the RFPA applies to financial institutions, which it defines as

> any office of a bank, savings bank, card issuer as defined in section 1602(n) of Title 15, industrial loan company, trust company, savings association, building and loan, or homestead association (including cooperative banks), credit union, or consumer finance institution, located in any State or territory of the United States, the District of Columbia, Puerto Rico, Guam, American Samoa, or the Virgin Islands.

12 U.S.C. § 3401. Sterling concedes that it is not a bank or a credit union, but argues that it is a "consumer finance institution" within the meaning of the RFPA. The FTC disputes this.

#### a. Sterling is Not a Consumer Finance Institution

It is axiomatic that the first stop in any journey of statutory interpretation is the plain text of the statute. *See Randall v. Loftsgaarden*, 478 U.S. 647, 656 (1986); *Harry v. Marchant*, 291 F.3d 797, 770 (11th Cir. 2002) (en banc) ("As with any question of statutory interpretation, we begin by examining the text of the statute to determine whether its meaning is clear."). *See also United States v. Zuniga-Arteaga*, 681 F.3d 1220, 1223 (11th Cir. 2012); *CBS Inc. v. Primetime 24 Joint Venture*, 245 F.3d 1217, 1225 n.6 (11th Cir. 2001) ("[T]he clear language of a statutory provision holds a status above that of any other canon of construction, and often vitiates the need to consider any of the other canons. Therefore, if the plain meaning rule is a canon of construction, it is the largest canon caliber of them all."). In interpreting statutory text, the Court analyzes "the language of the provision at issue, the specific context in which that language is used, and the broader context of the statute as a whole." *Zuinga-Arteaga*, 681 F.3d at 1223 (citing *Warshauer v. Solis*, 577 F.3d 1330, 1335 (11th Cir. 2009)).

Here, the only relevant question is whether "consumer finance institution," as defined in the RFPA, includes precious metals brokers such as Sterling. "When a statute includes an explicit definition, that definition must be followed, even if it varies from the term's ordinary meaning." *Harry*, 291 F.3d at 771 (citing *Stenberg v. Carhart*, 530 U.S. 914, 942 (2000)). By contrast, where the term at issue is *not* explicitly defined by the statute, the Court must look to its common usage to determine its meaning. *CBS Inc. v. Primetime 24 Joint Venture*, 245 F.3d 1217, 1222 (11th Cir. 2001) (quoting *Consolidated Bank, N.A. v. U.S. Dep't of Treasury*, 118 F.3d 1461, 1464 (11th Cir. 1997)). Because the RFPA does not explicitly define the phrase "consumer finance institution," the Court must interpret the phrase in light of its common and ordinary meaning.

In determining such ordinary meaning, our Court of Appeals has found guidance in dictionary definitions. *See, e.g., CBS Inc.*, 245 F.3d at 1223. Recognizing this, the parties point the Court to Black's Law Dictionary, which defines a "finance company" as "[a] nonbank company that deals in loans either by making them or by purchasing notes from another company that makes the loans directly to borrowers," BLACK'S LAW DICTIONARY 706 (9th ed. 2009), and further defines a "consumer finance company" as "[a] finance company that deals directly with consumers in extending credit." *Id.* The Court finds this definition to be consistent with its common sense interpretation, in light of reason and experience, of the ordinary meaning of the phrase "consumer finance company." But the term used by the RFPA is not "consumer finance company"—it is "consumer finance institution."

In this context, an "institution" is defined as

5

> . . . .
>
> **2a.** A custom, practice, relationship, or behavioral pattern of importance in the life of a community or society: *the institutions of marriage and the family*.  **b.** *Informal* One long associated with a specified place, position, or function.  **3a.** An established organization or foundation, especially one dedicated to education, public service, or culture.  **b.** The building or buildings housing such an organization.  **c.** A place for the care of persons who are destitute, disabled, or mentally ill.

AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 909 (5th ed. 2011).  *See also* BLACK'S LAW DICTIONARY 869 (9th ed. 2009) (defining "institution" as "An established organization, esp. one of a public character . . . .").  In other words, in this circumstance, institution means an established organization that is dedicated to or primarily established for a particular cause or purpose.  To be sure, a company can come within the definition of "an established organization," and a company can be an institution.  But Congress's use of the word "institution"—especially in light of its usage of "company" elsewhere in the same statute— indicates that it meant to define "institution" as something more than a company that only tangentially engages in financing.  *See generally Gustafson v. Alloyd Co., Inc.*, 513 U.S. 561, 574 (1995) ("[A] word is known by the company it keeps.").

By way of example, the Ford Motor Company was founded over a century ago and has grown into a multibillion-dollar automobile manufacturer that sells cars to consumers all over the world.  *See generally* Ford Motor Co., PROFITABLE GROWTH FOR ALL: 2012 ANNUAL REPORT 1– 3 (2013).  When consumers go to purchase a Ford automobile from their local dealer, few of them can afford to purchase one outright.  A significant portion of customers who finance their new Ford automobile do so through Ford Motor Credit Company LLC ("Ford Credit"), a wholly owned subsidiary of Ford Motor Company.  Ford Motor Credit Co. LLC, Annual Report (Form

10-K) 1–3, 21 (Feb. 19, 2013).  In addition to providing consumer financing, a substantial amount of Ford Credit's financing comes from providing lines of credit to Ford dealers to allow those dealers to purchase new and used vehicles from Ford which the dealers, in turn, sell to consumers.  *See id.* at 4–5.

Few would doubt that Ford fits into the common meaning of, say, an "automobile manufacturing institution."  Additionally, it is arguable that Ford Motor Company, through its subsidiary Ford Credit, comes within the ambit of a broad definition of "consumer finance company."  But the fact that it incidentally makes consumer loans through a subsidiary in connection with the sales of its automobiles does not render the Ford Motor Company itself a consumer finance *institution*.  If the FTC were investigating the manner in which Ford Motor Company marketed its automobiles, for example, Ford would be hard-pressed to use the RFPA as a broad shield against discovery requests for its transaction records or the contact information of its customers.

So with Sterling.  Sterling, by its own admission, acted simply as a broker for Worth.  Def.'s Resp. in Opp. 4, DE 67.  As Sterling's co-defendant and principal Francis Zofay described it, "we contact consumers in relations [sic] to precious metals, and we offer them the ability to take physical delivery or use our finance program."  Tr. of TRO Hrg. 163:17–19, Jun. 11, 2013, DE 23.  Once they had agreed to purchase precious metals from Sterling, Sterling's customers had two options:  they could either purchase physical metals which would then be delivered to them, or they could make a leveraged investment, paying approximately 20 to 35 percent of the total metals purchase upfront and financing the rest through Worth.  *Id.* at 171:20–172:3.  The

7

record does not reflect that Sterling earned any revenue from the financing of the precious metals it sold consumers. Rather, Sterling buttered its bread with the levy of an administrative fee of up to 15 percent of the consumers' total purchases. *See id.* at 179:24–180:14, 184:1–184:8. *Worth* was the company that financed the precious metals, and earned interest on that financing.[2] *See id.* at 165:14–16 ("Q: Okay. And is it effectively Worth that's extending credit? A: Correct."). Sterling's connection to the financing aspect of the overall transaction was tenuous at best.[3]

In further support of its position, Sterling directs the Court to the Bank Secrecy Act of 1970, 31 U.S.C. §§5311–5330, which defines "financial institutions" as including "a dealer in precious metals." According to Sterling, the Court should interpret "financial institution" in the RFPA to include precious metals dealers as well, because "[t]here is a presumption that Congress uses the same term consistently in different statutes." *Nat'l Treasury Employees Union v. Chertoff*, 452 F.3d 839, 857 (D.C. Cir. 2006). Assuming, without deciding, that this presumption is the law of this Circuit, Sterling's reliance on it is misplaced, as any presumption would be overcome by the explicit words of the statute. As noted above, where Congress explicitly defines a term in a statute, the Court is bound by that definition. The RFPA defines "financial institution" one way, and the Bank Secrecy Act defines it another way. The Court must assume that "Congress says what it means and means what it says." *Kehoe v. Fidelity Fed. Bank & Trust*, 421 F.3d 1209, 1216 (11th Cir. 2005). Sterling asks the Court to swap a definition in one

---

[2] The record reflects that Worth earns approximately 80 percent of its total revenue through the finance of precious metals. Decl. of Eugenia Mildner ¶ 7, attached as Ex. 1 to Def. Sterling Precious Metals, LLC's Notice of Filing, DE 75.

[3] Additionally, despite Sterling's claims, *see* Def.'s Supplemental Br. in Opp. to Pl's. Am. Mot. to Compel Produc. of Docs. 9–10, DE 79, the mere fact that the agreement between Sterling and Worth appears to impose some liability upon Sterling for certain loans made by Worth does not alter this conclusion.

statute for the explicit definition in another. Such a substitution would run contrary to established principles of statutory interpretation.

Finally, Sterling's definition of "consumer finance institution" is inconsistent with the canon of *noscitur a sociis*, which dictates that "a word is known by the company it keeps." *See Jarecki v. G.D. Searle & Co.*, 367 U.S. 303, 307 (1961) (noting that "noscitur a sociis … while not an inescapable rule, is often wisely applied where a word is capable of many meanings in order to avoid the giving of unintended breadth to the Acts of Congress"). Here, "consumer finance institution" appears in a list with the likes of credit unions, banks, industrial loan companies, savings bank, and card issuers. The entities in the definitional provision of the RFPA all appear to have financing as a core aspect of their business. Sterling's inclusion in such a list would be a non sequitur. *Accord CFTC v. Worth Bullion Grp.*, No. 12 C 2431, 2012 U.S. Dist. LEXIS 132592, at *4 (N.D. Ill. Sept. 17, 2012), *stayed*, 2012 U.S. Dist. LEXIS 160689 at *7–*8 (N.D. Ill. Nov. 8, 2012). *In toto*, the plain language of the statute, its specific context, and the broader statutory context of the RFPA make it clear that Sterling is not a consumer finance institution, and thus not a financial institution within the meaning of the RFPA.[4]

### b. Sterling is Not an Agent of Worth

In a final effort to convince the Court that it comes within the ambit of the RFPA, Sterling argues that even if it cannot independently be described as a "financial institution" within the meaning of the statue, it is an agent of Worth, which it claims *is* covered by the RFPA.

---

[4] In light of this conclusion, it is unnecessary for the Court to consider the RFPA's legislative history. *See Harry*, 291 F.3d at 772 ("Where the language of a statute is unambiguous, we need not, and ought not, consider legislative history"); *United States v. Veal*, 153 F.3d 1233, 1245 (11th Cir. 1998) ("Review of legislative history is unnecessary unless a statute is inescapably ambiguous.").

*See,e.g.,* 12 U.S.C. §3403(a) ("No financial institution . . . or agent of a financial institution, may provide to any Government authority access to or copies of, or the information contained in, the financial records of any customer except in accordance with the provisions of this chapter."). The term "agent" is not defined by the RFPA, so the Court must again look to its ordinary meaning. In its purest sense, "[a]gency is the fiduciary relationship that arises when one person ('a principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act." Restatement (Third) of Agency § 1.01 (2006). Under Florida law, "(1) acknowledgment by the principal that the agent will act for him, (2) the agent's acceptance of the undertaking, and (3) control by the principal over the actions of the agent" are all essential preconditions to the existence of a principal-agent relationship. *Goldschmidt v. Holman*, 571 So.2d 422, 424 n.5 (Fla. 1990).[5]

      Accordingly, as the FTC points out, under the common law understanding of agency, Sterling cannot claim to have been an agent of Worth unless and until both parties have indicated a desire to create an agency relationship. Sterling has not come forward with any information to demonstrate that Worth ever consented to have Sterling operate as its agent. Moreover, the parties have produced the account agreement between Sterling and Worth. Attach. A to App. 2 to Pl.'s Supplemental Br. in Supp. of its Am. Mot. to Compel Produc. of Docs., DE 78; Ex. A to Def.'s Supplemental Br. in Opp. To Pl's. Am. Mot. to Compel Produc. Of Docs., DE 79. That agreement, which was executed by both Sterling and Worth, reads in part:

---

[5] This Court, of course, is not bound by Florida law in its interpretation of a federal statute. *See generally Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938). The Court looks to *Goldschmidt* only in aid of its determination of the ordinary meaning of "agent."

10

> 4.2 **Role of Worth.** Worth acts as a principal and as such sells to and buys from customers *on its own behalf.* This means that Worth is a market maker and dealer in precious metals. Worth is not an exchange or brokerage house. Neither Worth nor any of its employees acts as an agent or fiduciary for any of Worth's customers. Worth does not offer managed accounts.

*Id.* at 2 (emphasis added). Other parts of the agreement between Sterling and Worth make it clear that Worth did not consent to have Sterling operate as its agent. As Worth's "retailer," Sterling was advised that "[i]n the process of selling precious metals to, and buying precious metals from, you, you should assume that the interests of Worth and its representatives conflict with your interests . . . . You are solely responsible for all purchasing, selling, and borrowing decisions from your account." *Id.* at 11. Finally, Sterling acknowledged that both it and its customers were "sophisticated investor[s] who understand[] that precious metals products can be purchased from and sold to competitors of Worth and that you have the alternative of doing business with these Worth competitors." *Id.* This last point is important here because it underscores that the relationship between Worth and Sterling was more akin to supplier-customer than principal-agent. For these reasons, the Court finds that Sterling has not presented sufficient evidence to show that it acted as an agent of Worth.[6]

### 3. Even if Sterling Was a "Financial Institution" within the Meaning of the RFPA, the Law Enforcement Exception is Applicable Here

But even if Sterling did come within the RFPA's definition of "financial institution," either independently or as an agent of Worth, the FTC argues the present circumstances fit within one of the RFPA's many exceptions. One of the exceptions to the RFPA is that

---

[6] In light of this finding, the Court declines to decide here whether Worth itself fits within the RFPA's definition of a financial institution, an issue that is currently pending before the United States Court of Appeals for the Seventh Circuit. *See CFTC v. Worth Bullion Grp., Inc.*, No. 12-3372 (7th Cir.).

> Nothing in this chapter (except sections 3403, 3417, and 3418 of this title) shall apply when financial records are sought by a Government authority—
> (A) in connection with a lawful proceeding, investigation, examination, or inspection directed at a financial institution (whether or not such proceeding, examination, or inspection is also directed at a customer) or at a legal entity which is not a customer; or
> (B) in connection with the authority's consideration or administration of assistance to the customer in the form of a Government loan, loan guaranty, or loan insurance program.

12 U.S.C. § 3413(h)(1) (the "law enforcement exception"). Additionally, when the Government seeks records pursuant to this exception, it must first certify to the target financial institution that it has complied with the applicable provisions of the RFPA. *Id.* §§ 3403(b); 3413(h)(2). The FTC has provided Sterling with such a certification. *See* Att. H to Pl.'s Am. Reply in Supp. of its Mot. to Compel, DE 74. Moreover, the parties do not dispute that the FTC qualifies as a "Government authority." Accordingly, the FTC argues that *even if* Sterling is a "financial institution" within the meaning of the RFPA, Sterling cannot withhold its customer records because of this exception.

Sterling, however, contends that the FTC's reading of the exception leaves out the language "(except for sections 3403, 3417 and 3418 of this Title)." Section 3403 prohibits a financial institution from giving "to any Government authority access to or copies of, or the information contained in, the financial records of any customer except in accordance with the provisions of this chapter." 12 U.S.C. §3403(a). Since various parts of the RFPA require customer notification, Sterling claims, the compliance certification does not absolve the FTC of its prior notification requirements.

The Court agrees that the law enforcement exception explicitly excludes Section 3403.

But the savings clause of Section 3403(a), namely "except in accordance with the provisions of this chapter," means just that. "The provisions of this chapter" include the exceptions to the notification requirement that are set forth in other parts of the RFPA. Sterling's argument in this regard is ultimately without merit. Sterling's interpretation would effectively read the "exception" part of the law enforcement exception out of the RFPA. The FTC, a Government authority, seeks the financial records of Sterling's customers in connection with a lawful proceeding (this lawsuit) directed at a financial institution (assuming Sterling is one). Moreover, the FTC has provided the required certification. Accordingly, this situation fits squarely within the RFPA's law enforcement exception.

In sum, (1) Sterling is not subject to the RFPA; (2) Sterling is not an agent of Worth; and (3) even if Sterling were subject to the RFPA, the FTC's investigation in this context falls within the law enforcement exception. Accordingly, Sterling's RFPA objections are overruled, and Sterling will be required to produce its customer account information.[7]

### B. Sterling Cannot Be Compelled to Turn Over Discovery It Does Not Have

Sterling also responded to a number of the FTC's requests saying that it did not possess the requested information or that it had provided the FTC with all the relevant information it possessed. At the hearing on this matter, the FTC told the Court that it was suspicious that a supposed legitimate business such as Sterling would not have customary business records, such

---

[7] Sterling repeatedly notes its concern that its former customers are individuals who would be very concerned about the Government getting their personal financial information. In particular, Sterling intimates that its former customers are especially uneasy about the FTC sharing their information with other Government agencies, including the Internal Revenue Service and the Federal Bureau of Investigation. *See, e.g.,* Def.'s Supp. Br. in Opp. 6–7, DE 79. Yet, aside from its objections pursuant to the RFPA, Sterling has not availed itself of any other tools which may be available to minimize such information sharing, such as a request for a protective order. *See* Fed. R. Civ. P. 26(c).

as employment applications. The Court agreed and ordered Sterling to file an affidavit detailing its efforts to locate and search for the material. Sterling did so. *See* Zofay Decl., DE 77.

The rules require only that a litigant turn over that which is within its "possession, custody, or control." Fed. R. Civ. P. 34(a)(1). In light of Sterling's sworn affidavit and with nothing contrary in the record, the court must take Sterling's representations at face value. The Court cannot order Sterling to turn over that which it does not have, and accordingly, the Court must deny the FTC's request to compel production of Requests 1, 2, 3, 4, 5, 6, 7, 14, and 16.[8]

### C. Sterling's Website (Request 17)

In Request 17, the FTC requests

> An operable copy (including all underlying code) of each version of all websites used by any Defendant to market, sell, or promote, any good or service including, but not limited to, precious metals, gemstones, or investments or, if any Defendant does not have an operable copy of any website (including underlying code), a signed authorization identifying and directing the web host or other person in possession of such copy to permit Plaintiff to inspect, copy, test, or sample the website.

Pl.'s Am. Mot. at 14, DE 61. Sterling claims it does not have an operable copy of the website, but objects to being compelled to submit a signed authorization to the FTC because, according to Sterling, the civil rules do not allow for such an imposition. The Court requested and has reviewed supplemental briefing on this issue. As noted above, the discovery rules require a party to turn over anything in its "custody, possession, *or control*." Fed. R. Civ. P. 34(a)(1) (emphasis added). "Control is defined not only as possession, but as the legal right to obtain the documents requested upon demand." *Searock v. Stripling*, 736 F.2d 650, 653 (11th Cir. 1984).

The Court has been unable to locate any binding authority that deals directly with the

---

[8] The Court reminds Sterling that it has an ongoing, good-faith obligation to produce all responsive documents. If these documents turn up during the course of this litigation, Sterling must produce them immediately.

14

question of whether a party may compel the opposing party to produce a signed authorization for website code.  Yet, similar cases provide some guidance.  A number of courts have held that parties may not be compelled to sign an authorization for the release of medical records.  *See Klugel v. Clough*, 252 F.R.D. 53, 54–55 (D.D.C. 2008); *Clark v. Vega Wholesale, Inc.*, 181 F.R.D. 470, 471 (D. Nev. 1998); *Becker v. Securitas Sec. Svcs. USA, Inc.*, No. 06-2226-KHV-DJW, 2007 WL 677711, at * 3 (D. Kan. Mar. 2, 2007) ("Rule 34 contains no provision requiring a party to sign a release or authorization so that the requesting party may obtain a document directly from a non-party.").  *See also Chase v. Nova Southeastern Univ.*, No. 11-61290-CIV, 2012 WL 1936082, at *1 (S.D. Fla. May 29, 2012) ("This Court agrees with the courts that have ruled that they do not possess the authority to routinely require a plaintiff to execute a release for medical records.").

On the other hand, in *Flagg v. City of Detroit*, 252 F.R.D.346 (E.D. Mich. 2008), the defendant City refused to authorize its mobile telephone provider SkyTel to produce certain text messages that the plaintiff sought in the course of discovery.  The *Flagg* court reasoned that because Detroit and Skytel had a contractual relationship under which Detroit was allowed to permit or block the disclosure of text messages to a third party, Detroit had a "legal right to obtain" the text messages.  *Id.* at 354–55.  Accordingly, the messages were within Detroit's control under Rule 34 and therefore subject to disclosure.  Similarly, in *Tomlinson v. El Paso Corp.*, 245 F.R.D. 474 (D. Colo. 2007), the court confronted an ERISA action where the defendants refused to produce electronic records that were in the possession of its third-party record keeper.  Because the defendants had a non-delegable statutory duty to maintain the

requested information, and they had the authority and ability to obtain that information, the court found that it was within their control for discovery purposes. *Id.* at 477.

The undersigned finds the *Flagg* court's reasoning to be persuasive. In the present case, the FTC is not asking for information proprietary to the web host. Rather, it only requests that compartmentalized information relevant to the operation of Sterling's website. As a customer of its web host, Sterling surely has the contractual right to obtain that data. Accordingly, that information is within its control under Rule 34 and must be provided to the FTC. Moreover, the Court notes that in this context, complying with the request would not impose any great burden on Sterling. Accordingly, the FTC's motion will be granted as to Request 17. Sterling may either obtain the information from its web host and then turn it over to the FTC, or alternatively, provide the FTC with written consent to obtain its code from the relevant party(ies).

### D. Costs/Attorneys' Fees

The FTC's motion also requests costs and attorneys' fees pursuant to Rule 37. Because the motion is granted in part and denied in part, and because the Court finds that Sterling was substantially justified in its position, the Court will deny this request. *See* Fed. R. Civ. P. 37(a)(5). *See also Devaney v. Continental Amer. Ins. Co.*, 989 F.2d 1154, 1163 (11th Cir. 1993).

### IV.    Conclusion

For the foregoing reasons, it is hereby

**ORDERED** that Plaintiff Federal Trade Commission's Amended Motion to Compel [DE 61] is **GRANTED in part and DENIED in part**; and it is

**FURTHER ORDERED** that within 10 days of the date of this order, Defendant Sterling

Precious Metals, LLC shall provide responsive documents, to the extent it has those documents within its possession, custody, or control, to Requests 1, 8, 9, 10, 11, 12, 13, 15, 18, 19, 20, 21, 22, and 23; and it is

**FURTHER ORDERED** that within 10 days of the date of this Order, Defendant Sterling Precious Metals, LLC will make a good-faith effort to obtain the underlying code of its website from its webhost and turn that information over to Plaintiff Federal Trade Commission, or, in the alternative, execute and deliver a written release to Plaintiff allowing it to access the code from the relevant party(ies); and it is

**FINALLY ORDERED** that Plaintiff Federal Trade Commission's request for sanctions is **DENIED**.

**DONE AND ORDERED** in Chambers at West Palm Beach, Palm Beach County, Florida, this **9th** day of April, 2013.

_____
WILLIAM MATTHEWMAN
United States Magistrate Judge